# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 09-CR-695 (JFB)

---

UNITED STATES OF AMERICA,

versus

WILLIAM E. SCHAEFER,

Defendant.

---

**MEMORANDUM AND ORDER**
May 1, 2012

---

JOSEPH F. BIANCO, District Judge:

Defendant William E. Schaefer ("defendant" or "Schaefer") was indicted on October 7, 2009 on one count of possession of child pornography, in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and 2252(b)(2).

Schaefer moved to suppress statements he made to law enforcement officers and evidence seized by law enforcement officers during a search of defendant's home on August 20, 2007, arguing that he did not voluntarily consent to the search because, *inter alia*, federal agents refused to allow him to place a telephone call to his brother, a Nassau County police officer, during the search. In addition, Schaefer moved to dismiss the indictment for pre-indictment delay, in violation of the defendant's due process rights guaranteed by the Fifth Amendment, because he was not arrested until October 16, 2009, which was over two years after the search.

At a conference on November 9, 2010, after counsel for defendant conceded that there was no actual prejudice from the pre-indictment delay, the Court denied defendant's request for an evidentiary hearing on that issue, denied that portion of the motion, and stated that a written order would follow. With respect to the motion to suppress, on November 9, 2010 and November 15, 2012, the Court conducted an evidentiary hearing regarding the consent issue and, on February 1, 2011, the Court orally denied the motion to suppress for reasons set forth in detail on the record. The Court now issues this Memorandum and Order regarding the motion to dismiss for pre-indictment delay and to supplement its oral ruling on the motion to suppress, including a more detailed discussion of the relevant case authority.[1]

---

[1] On June 16, 2011, after a jury trial, the jury returned a guilty verdict on the one-count indictment.

I. FACTS

At the evidentiary hearing, the Court heard testimony from Special Agent Joseph Lazzara, Special Agent Eric Mancini, and from the defendant. After evaluating the credibility of the witnesses, and the other evidence offered at the hearing, the Court makes the following findings of fact. With respect to the findings of fact, the Court notes that it found the testimony of Special Agent Lazzara and Special Agent Mancini to be fully credible in light of their demeanor and the other evidence offered at the hearing. Moreover, as discussed below, the defendant agreed, to a substantial extent, with their testimony and, where he contradicted the agents' testimony as to certain key aspects of the circumstances surrounding the search, the Court found the defendant not to be credible in light of his demeanor and the other evidence.

A. Findings of Fact[2]

1. Search on August 20, 2007

On August 20, 2007, Special Agent Joseph Lazzara ("Agent Lazzara"), then employed by Immigration and Customs Enforcement ("ICE"), went to defendant's residence at 29 Town Path in Glen Cove, New York, with ICE Special Agent Rosanna Licitra ("Agent Licitra"), and with Nassau County Detective Betty Egan ("Detective Egan"). (Nov. 9, 2010 Tr.[3] at 3-5.) Agent Lazzara, Agent Licitra, and Detective Egan visited the defendant's residence intending to conduct a "knock and talk," also known as a "consent search," to see if there was child pornography on the defendant's computer. (*Id.* at 6.) ICE had received the lead about the defendant from Operation Flicker, an undercover operation run out of ICE's Birmingham, Alabama office. (*Id.*) Agents in Birmingham had gotten a tip that a PayPal account was to be used nationwide as an access point to a child pornography website. (*Id.*) After conducting a warrant search on the PayPal account, agents were able to obtain the names of numerous individuals who had gained access to the child pornography website. (*Id.*) As a result of this search, Agent Lazzara was provided with defendant's name, home address, telephone number, and email address. (*Id.* at 6-7, 35.) On cross-examination, Agent Lazzara stated that, prior to the visit to Schaefer's house, he did not discuss with his supervisor, or any other officers engaged in the investigation, whether to get a search warrant for the defendant's home and seizure of his computer. (*Id.* at 40.)

On August 20, 2007, at approximately 5:30 p.m., the agents and detective approached the defendant's front door and knocked. (*Id.* at 8, 45.) The defendant opened the door, and Agent Lazzara explained that they were conducting an investigation regarding the use of a computer through the internet to obtain child pornography images. (*Id.* at 8.) The defendant allowed the agents and detective to come inside. (*Id.* at 9.) In response to Agent Lazzara's questions, the defendant said that he lived alone, owned a computer that was hooked up to the internet, and had an email account with the same address as the email address provided through Operation Flicker. (*Id.* at 9-10.) The defendant said he used the internet to pay bills, "conduct e-trade," and purchase fishing equipment. (*Id.* at 10.) The defendant

---

[2] These findings of fact are taken from the testimony of Agents Lazzara and Mancini, whom the Court found to be fully credible.

[3] "Nov. 9, 2010 Tr." refers to citations to the transcript of the November 9, 2010 suppression hearing.

2

further stated that he had adult pornography on his computer, and that he paid approximately $29 per month with his credit card to belong to an adult pornography website. (*Id.* at 10-11.) The defendant told the agents and detective that about a week before the August 20, 2007 visit, he had been the victim of credit card fraud. (*Id.* at 11, 13-14.) Agent Lazzara asked the defendant if he understood the definition of child pornography, and the defendant responded that it involved the sexual penetration of an individual under the age of 18. (*Id.* at 14, 70.) At that point, the defendant stated that he had not sought out child pornography, was not interested in child pornography, and had no child pornography on his computer. (*Id.* at 14-15.)[4]

The defendant's demeanor, when they began discussing child pornography, was agitated and nervous. (*Id.* at 15.) Agent Lazzara said that the defendant was "moving around a little bit" and had trouble making eye contact. (*Id.*) Agent Lazzara "got the sense that there was something bothering him." (*Id.*) Agent Lazzara was concerned for officer safety, particularly because they were in relatively close proximity. (*Id.* at 15-16.)

About midway through the interview – probably close to 5:45 p.m. – the defendant told Agent Lazzara that he was going to call his brother. (*Id.* at 16, 58, 71.) Agent Lazzara testified that he believed that the defendant mentioned that his brother was a police officer. (*Id.* at 16, 65-66, 71.) Agent Lazzara wanted to ask the defendant some additional questions before the defendant made the phone call, but the defendant "reached behind him and basically grabbed the phone and brought it up fast." (*Id.* at 16.) The phone was a handheld set for a land line, and was located on an end table or coffee table next to the couch. (*Id.* at 59) The defendant's reach for the phone happened in a "split second," and surprised Agent Lazzara. (*Id.* at 16.) He testified that he "felt threatened by it." (*Id.*) The agent told the defendant to hang up the phone, and the defendant complied. (*Id.* at 16-17.)[5] Agent Lazzara thought the defendant seemed calmer and less agitated after he hung up the phone. (*Id.* at 17.)

Agent Lazzara continued the interview, asking if the defendant had ever received child pornography on his computer. (*Id.*) The defendant responded that any child pornography he received consisted of unsolicited emails. (*Id.*) At that point, Agent Lazzara asked Schaefer if the agents could look at Schaefer's computer. (*Id.* at 18.) The defendant gave verbal consent to allow the agents to search his computer. (*Id.* at 18-19.) Agent Licitra's notes indicate that the defendant gave verbal consent at 5:45 p.m. (*Id.* at 19.) The defendant subsequently signed a written consent form to search the

---

[4] On cross-examination, Agent Lazzara testified that he did not recall asking the defendant if there were any young girls in the house, but, in the "course of doing knock and talks over the years," it was a question he would probably ask. (*Id.* at 47.) Thus, the Court assumes that Agent Lazzara asked that question.

[5] As discussed *infra*, the defendant testified that Agent Lazzara, when he asked the defendant to hang up the phone, became "shocking loud, like you would yell at your son or your dog or something." (Nov. 15, 2012 Tr. at 15.) Agent Lazzara testified that the defendant initially refused to put down the phone, and, at that point, "I raised my voice and told him to hang up the phone." (Nov. 9, 2010 Tr. at 60.) The Court finds that Agent Lazzara used a loud voice at this point, but does not conclude that he was verbally abusive at any point during the interview.

3

computer. (*Id.* at 18-19; Gov. Ex.[6] 1.)[7] The form indicates that the defendant signed the consent form at 5:50 p.m. (Nov. 9, 2010 Tr. at 19, 55; Gov. Ex. 1.) Less than 30 seconds passed between when the defendant gave verbal consent and when he gave written consent. (*Id.* at 53-54.) Agent Lazzara filled out the consent form, handed it to the defendant, and the defendant signed it. (*Id.* at 54.) Agent Lazzara did not recall if he asked the defendant to read the document. (*Id.*)

Agent Licitra began to examine the computer after receiving the defendant's verbal and written consent. (*Id.* at 20, 56.)[8] Agent Licitra called Agent Lazzara over to the computer and showed him a number of images that appeared to be child pornography. (*Id.* at 21.) Agent Licitra wrote down image titles for those images, and those same image titles were recovered later by a computer forensic agent. (*Id.* at 22.) After viewing the images, Agent Lazzara asked Schaefer about them, and Schaefer said that they came from a website called "BD Dog."[9] (*Id.* at 25.) Schaefer thought the individuals in the pictures were 9 to 10 years old, and that the images came from Europe. (*Id.*) The defendant became very agitated at that point, and leaned over Agent Lazzara and shut off the computer. (*Id.* at 25-26, 62.) The agents did not turn the computer back on that day. (*Id.* at 26.)

At some point during the interview, Agent Lazzara asked how long Schaefer had been collecting such images, and the defendant stated that he had eight years' worth of stuff. (*Id.*) The defendant also said that when he drank, he did stupid things. (*Id.*) Before leaving with the computer, the agents gave the defendant a chain of custody form for receipt of the computer.[10] (*Id.*) A computer forensic examination was subsequently completed, and child pornography images were located on the computer. (*Id.* at 27.) Schaefer called Agent Lazzara at some point to ask about the status of his computer, and when he would get it back. (*Id.* at 69-70.) As of the date of the hearing, the computer had not been returned to Schaefer. (*Id.* at 27.)

---

[6] "Gov. Ex. 1" was admitted into evidence at the Nov. 9, 2010 hearing. (*Id.* at 18-19.)

[7] The written consent form states, in bold and capital letters on the top, the following: "CONSENT FOR SEIZURE, SEARCH AND EXAMINATION OF COMPUTERS AND RELATED MATERIALS." (Gov. Ex. 1.) It further states, "I, William Schaefer, having been advised of my right to refuse consent, do hereby give consent and authorize the DHS/ICE and any other agency or person cooperating with this agency, to search the following premises: Computer 29 Town Path, Glen Cove NY. I further consent and authorize the seizure and examination of any items that law enforcement personnel determine may be related to their investigation, including, but not limited to computers and computer-related equipment. I understand that the information obtained by such search and examination may be used against me or used for the purpose of obtaining leads to other evidence. No threats or promises have been made to me by anyone in exchange for this consent." (*Id.*)

[8] On cross-examination, Agent Lazzara testified that he did not remember if the computer was turned on or not before Agent Licitra began her examination. (Nov. 9, 2010 Tr. at 52.)

[9] The name of the website is not clear from the transcript, which also refers to the site as "bdcomp." (*Id.* at 25, Nov. 15, 2010 Tr. at 45.)

[10] On cross-examination, Agent Lazzara said that he believed they had probable cause to seize the computer, but did not have probable cause at that point to arrest the defendant. (Nov. 9, 2010 Tr. at 67.)

Agent Lazzara, Agent Licitra, and Detective Egan were all wearing plain clothes at the interview, and none of them drew their guns, which were concealed.[11] (*Id.* at 28.) The interview with Schaefer lasted one half-hour at most. (*Id.* at 49.)

2.  Arrest on October 16, 2009

Special Agent Eric Mancini ("Agent Mancini"), an ICE agent, participated in the defendant's October 16, 2009 arrest at the defendant's residence in Glen Cove. (*Id.* at 74.) The agents had a warrant for the defendant's arrest, though they did not have a search warrant for his house. (*Id.* at 80.) The defendant verbally consented to a search of his residence, though the agents did not actually conduct a search on that date. (*Id.* at 81-82.) Although Agent Mancini testified that the defendant "possibly" signed a consent form, the government stipulated that the form indicated that the defendant had refused to sign. (*Id.* at 81.)

Agent Mancini testified that he observed someone read the standard *Miranda* warnings sheet to Schaefer at the time of his arrest, though Schaefer did not provide a written waiver of his rights. (*Id.* at 75-76.) When the agents arrived at the defendant's house, the defendant was not dressed, so the agents accompanied him to the bedroom, where he dressed to leave his residence. (*Id.* at 76-77.) While he was getting dressed, the defendant "kept on repeating" and "remarking" on how long it took for the agents to arrest him after they seized his computer. (*Id.* at 77.) According to Agent Mancini, the defendant also said that if he "would have known it would have taken you so long to come back and arrest me, I would have booked." (*Id.*) Agent Mancini took this statement to mean that the defendant "would have tried to escape justice and perhaps become a fugitive." (*Id.* at 77-78.)

B. Defendant's Testimony

The defendant testified on his own behalf. The Court has summarized the defendant's testimony below. As noted *infra*, the defendant's testimony was consistent with the testimony of the government agents as to a substantial portion of the facts. However, where the testimony diverged on certain material facts regarding the timing and nature of the consent to search, the Court found the defendant's testimony not to be credible in light of his demeanor and all the evidence presented. The Court will note these factual discrepancies in the analysis portion of this Memorandum and Order.

Defendant explained that he was 53 years old, has a high school degree, and had worked for 35 years at Waldbaum's Supermarket, where was the deli manager. (Nov. 15, 2010 Tr.[12] at 3-4.) He testified that, on the evening of August 20, 2007, he noticed two women and one man walking up his driveway. (*Id.* at 6-7.) The defendant opened the door and asked if he could help them. (*Id.* at 7.) They responded by identifying themselves as federal agents and

---

[11] Agent Lazzara was asked a series of questions regarding his practices regarding "knock and talks." Agent Lazzara stated that other "knock and talks" he has participated in have been unsuccessful because the agents will leave if the individual refuses to let them in, or if the individual asks if they have a warrant. (*Id.* at 29.) Similarly, Agent Lazzara testified that if an individual lets the agents in, but later says that he wants to call his attorney, the agents immediately stop what they are doing. (*Id.*)

[12] "Nov. 15, 2010 Tr." refers to citations to the transcript of the November 15, 2010 suppression hearing.

5

stating that they had a "personal, private matter" to discuss with the defendant. (*Id.*) The defendant testified that the agents never told him that he had a right to refuse their entry into his home. (*Id.* at 21.)

After the defendant let them into the apartment, Agent Lazzara asked if the defendant had any little girls hidden in the house. (*Id.* at 7-8.) The defendant responded that he did not. The agents asked the defendant if he had a computer, and he said that he did. (*Id.* at 8.) The agents also asked the defendant what he considered to be child pornography, and the defendant responded that child pornography included "[a]nyone under the age of 18 involved with like sexual penetration or intercourse." (*Id.* at 8-9.) The defendant testified that he noticed that Agent Licitra had a black sidearm in a block holster exposed on her right hip, as well as a white canister that he assumed to be mace or pepper spray. (*Id.* at 10.)

As the defendant sat on the couch, and the three agents sat on the other side of the coffee table, the defendant grabbed for his telephone. (*Id.* at 14.) The defendant told Agent Lazzara that he wanted to call his brother, a Nassau County police officer, for advice. (*Id.*) After the defendant told him who he was calling, Agent Lazzara "became very loud and he demanded that I hang up the phone." (*Id.* at 15.) The defendant testified that Agent Lazzara became "shocking loud, like you would yell at your son or your dog or something." (*Id.*) The defendant put down the phone at that point and "just sat there." (*Id.*) He testified that he "didn't know what to do" and "felt like [he] had no choice." (*Id.*) At that point, Agent Lazzara asked to see the computer, and the defendant gave the agents verbal consent to search it. (*Id.*) He testified that he "felt [he] had no choice" because there were "three of them and one of me." (*Id.*) The defendant testified that he gave the verbal consent after he had hung up the phone. (*Id.* at 20.)

Agent Licitra then sat down in front of the computer. (*Id.* at 16.) According to the defendant, the computer was off, and Agent Licitra turned it on. (*Id.*) After Agent Licitra turned on the computer, the defendant told the officers that he had changed his mind, and reached over to shut the computer off. (*Id.* at 17.) The defendant testified that the computer had been on for 10-15 seconds, "tops." (*Id.*) As the defendant reached over to start to shut the computer off, Agent Licitra pointed to a single picture and said that it could be child pornography. (*Id.* at 18.) Agent Lazzara then stated that they would seize the computer. (*Id.*) The defendant testified that, at about 5:50 p.m., after Agent Licitra had already examined the computer, the defendant signed the consent form for the search and seizure of his computer. (*Id.* at 19-20.) The defendant testified that he did not read the consent to search form that he signed on August 20, 2007 because he did not have his glasses on. (*Id.* at 33.)

On cross-examination, the defendant testified that he told the agents, prior to the examination of the computer, that the only pornography that he used the computer for was adult pornography. (*Id.* at 34.) The defendant told them that any child pornography on the computer came from unsolicited emails, and that he had never joined a child pornography subscription website. (*Id.* at 34-35.) The defendant testified that he had once used his credit card to put money on Paypal, and then used Paypal to join a paid website. (*Id.* at 24.) The defendant also told the agents that he had recently been the victim of credit card fraud. (*Id.* at 35.)

6

After the agents found an image on the computer that they believed to be child pornography, the defendant admitted that he had received child pornography from a site called "bdcomp." (*Id.* at 45.) He explained that the site had emailed him stuff for about a year. (*Id.*) The defendant further testified that he had said to the agents that children depicted in photos were 9 to 10 years old, but denied that he was referencing the images they found in his apartment that day. (*Id.*) He said, rather, that he was referring to a modeling site. (*Id.*) The defendant told the agents that the photos were sent from Europe. (*Id.* at 46.) The defendant agreed that he had told the agents on the day of the search that he was an alcoholic and that he did stupid things when he drank. (*Id.*) Finally, the defendant stated that he had admitted to the agents that the images were sent to him and that he knew they were in the computer. (*Id.*) He testified that he had told the agents that the emails were unsolicited and came from sites with disclaimers that said the images were perfectly legal. (*Id.* at 47.) The defendant agreed that he must have saved the photos because they were in his "my documents, my pictures" folder, but stated that he did not remember the pictures. (*Id.* at 50.) He conceded that "some of" the pictures the Assistant United States Attorney ("AUSA") showed him would be child pornography. (*Id.* at 50-51.)

The defendant testified that, during the agents' visit, he felt that he couldn't leave the house, but also explained that the agents never told him that he couldn't leave the house. (*Id.* at 31.) The defendant agreed that the agents were present for approximately half an hour. (*Id.*)

With regards to the arrest on October 16, 2009, the defendant testified that he told Agent Mancini that he "could have" booked. (*Id.* at 25.) He said he was taking a shower at the time – 5:45 a.m. – and that it was a "little frightening" when he heard banging and knocking at the door. (*Id.*) The defendant stated that the agents read him his *Miranda* warnings, but his statement about how he could have booked was "just babbling" and was not in response to those warnings. (*Id.* at 26.) At some point during the arrest, the agents presented the defendant with a form, which he refused to sign. (*Id.* at 26-27.)

II. PROCEDURAL HISTORY

On August 26, 2010, defendant filed a motion to dismiss the indictment for pre-indictment delay and a motion to suppress evidence obtained during the search and seizure on August 20, 2007 at the defendant's home. On September 24, 2010, the government filed its opposition. On October 8, 2010, the defendant filed his reply. On November 9, 2010, the Court denied the motion to dismiss the indictment based upon pre-indictment delay, including the denial of a hearing on that issue. The Court noted that a written decision would follow. On November 9, 2010, the Court held an evidentiary hearing on the motion to suppress. That hearing was continued and completed on November 15, 2010. The defendant filed a post-hearing memorandum of law on December 6, 2010. The government responded to that memorandum on December 20, 2010. The defendant filed a reply on January 6, 2011. At a conference on February 1, 2011, the Court denied the motion to suppress and orally placed its reasons on the record.

7

III. Discussion

A. Motion to Suppress

Schaefer has moved to suppress any evidence obtained as a result of the August 20, 2007 search on the grounds that his consent to the search of his home and the seizure of his computer was not voluntary. As set forth below, and for the reasons set forth on the record on February 1, 2011, the Court finds that the government has met its burden of proving that the defendant voluntarily consented to the search and seizure under the totality of the circumstances.

1. Applicable Law

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). When the government seeks to justify a search on the basis of the subject's consent, and the subject is not in custody, the government must demonstrate that the consent "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Id.* at 248. Thus, the government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983); *see also United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) ("when, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary"); *accord United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004).

Whether consent was voluntarily given is "a question of fact to be determined from all the circumstances." *Schneckloth*, 412 U.S. at 248-49. The "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quotations and citations omitted). The standard for evaluating a subject's consent is "'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

In assessing the "totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation," the Supreme Court has considered various factors. *Schneckloth*, 412 U.S. at 226. For example, some of these factors include "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *Id.* (citations omitted). In each case, the Supreme Court's decision "reflected a careful scrutiny of all the surrounding circumstances," as opposed to "the presence or absence of a single controlling criterion."

8

*Id.* For example, "'the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search.'" *United States v. Tortorello*, 533 F.2d 809, 814 (2d Cir. 1976) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). Courts have also considered relevant factors such as "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent." *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (footnotes omitted) (collecting cases). In addition, the government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness. *See United States v. Drayton*, 536 U.S. 194, 206-07 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."); *see also Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."); *United States v. Crespo*, 834 F.2d 267, 271-72 (2d Cir. 1987) ("Nor under *Schneckloth* does the Government have an affirmative duty to advise a suspect that he may refuse his consent to an apartment search.") (citation omitted).

2. Analysis

Applying the above-referenced standard to the facts of this case, the Court concludes that the defendant voluntarily consented to the search. As discussed below, the surrounding totality of the circumstances, including the details of the interview and search as well as the characteristics of the defendant, make clear that the consent to search by the defendant was voluntary.

First, the circumstances surrounding the consent to search were non-coercive. In particular, the Court finds that (1) the defendant was approached at his own residence during the early evening; (2) the two agents and detective who came to his home to speak with him were in plain clothes, and their weapons were not drawn; (3) the agents asked the defendant for permission to enter his home, which he granted; (4) the agents introduced themselves and stated that the reason for the visit related to child pornography; (5) the defendant was never handcuffed or placed in custody by the agents; (6) the entire interview and search took one-half hour; and (7) no threats or promises were made to the defendant during the interview or search.

Second, the defendant orally consented to the search and also signed a written consent form which (1) specifically advised him of his right to refuse consent, (2) stated that he understood that information obtained by the search could be used against him, and (3) stated that no threats or promises had been made in exchange for consent.

Third, with respect to the characteristics of the defendant, the Court notes that the defendant is a 53-year old who graduated high school, reads English, manages a deli department, and is familiar with computers. Thus, his personal characteristics also favor

a finding that he voluntarily consented to the search.[13]

The key fact upon which defendant relies, in an attempt to demonstrate that his verbal and written consent was involuntary, is the fact that Agent Lazzara refused to allow the defendant to call his brother during the search. However, the Court concludes that the refusal to allow the defendant to call his brother, when considered in conjunction with the totality of the circumstances, does not transform what is clearly a voluntary consent to search into an involuntary one. As a threshold matter, the Court notes that there is no absolute constitutional right to a telephone call during police questioning, even after an arrest (which did not occur here); however, such a constitutional right can be implicated if it relates to other constitutional rights, such as the right to consult with counsel. *See, e.g.*, *Harrill v. Blount Cnty.*, 55 F.3d 1123, 1125 (6th Cir. 1995) ("The right to make a phone call immediately upon arrest is not a recognized property right, nor is it a traditional liberty interest recognized by federal law."); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1145 n.2 (7th Cir. 1983) ("[T]here is no constitutional requirement that a phone call be permitted upon completion of booking formalities."); *accord Dietzen v. Mork*, No. 95-2086, 1996 WL 625605, at *2 (7th Cir. Oct. 25, 1996) ("Dietzen's federal constitutional rights were not violated by the temporary deprivation of telephone privileges. We decline to adopt Dietzen's assertion that he had an absolute constitutional right to a telephone call. . . . Rather, the right to make a telephone call occurs only when certain constitutional rights are implicated, for example the right to consult with counsel." (citations omitted)); *Cannon v. Montgomery County, PA*, No. CIV.A.96-CV-7405, 1998 WL 354999, at *7 (E.D. Pa. June 29, 1998) ("There is . . . no constitutional right to make a telephone call upon arrest or completion of booking.").

Here, defendant is not claiming that he was trying to call an attorney during the non-custodial questioning by the agents at his home; rather, he wanted to contact his brother, who is a police officer. Defendant had no constitutional right to do so, and the police in this case (as in many cases) certainly had valid law enforcement reasons, including safety concerns, for not allowing an interviewee to make phone calls to unknown individuals during an interview at the person's home. However, notwithstanding the fact that it is not constitutionally required and that there are valid reasons for the police decision, the denial of the telephone call to the non-attorney brother still must be considered in conjunction with the totality of the circumstances in determining whether the defendant's consent to search was voluntary. In other words, the Court must examine whether such denial rendered the situation sufficiently coercive that the defendant's consent was not voluntary. Having carefully considered this issue, the Court finds that this denial of the call to the brother did not vitiate or undermine what was clearly a

---

[13] The Court notes that, although it took place over two years after the search at issue in this case, the government argues that the fact that the defendant refused to sign the consent to search form at the time of his arrest also provides additional support for the conclusion that, with respect to the defendant's personal characteristics, he is more than capable of declining consent even under a much more coercive situation involving arrest and custody. Nonetheless, as the Court stated at the time of its oral ruling, the Court does not believe that any probative value of this post-search event is necessary to support the voluntariness of the search on the date in question.

voluntary consent. In particular, the Court notes that, after the denial of the telephone call, the defendant was presented with and signed the consent form, which explicitly stated that he had the right to decline the search. Thus, notwithstanding the fact that he did not get to contact his brother, he undoubtedly understood his legal right to refuse consent. In addition, the non-coercive nature of the situation is further evidenced by the fact that, after the denial of the phone call and after the consent, the defendant was still able to move freely around the house to such extent that, at one point, he reached over and turned the computer off during the agents' viewing of the pornography on the computer. If the defendant truly believed he was in a custodial and/or coercive setting, he certainly would not have believed he was free to go over and turn the computer off during the search. Thus, the defendant's actions following the denial of the telephone call – including signing the consent form advising him of his right to refuse consent and then turning the computer off during the search – make clear, in conjunction with the totality of the circumstances – that the situation remained non-coercive throughout the interview and that the consent to search was voluntary.

In *United States v. Tejada*, No. 04 CR. 1174 (LMM), 2005 WL 2677891 (S.D.N.Y. Oct. 20, 2005), Judge McKenna reached a similar conclusion in denying a motion to suppress. In particular, in *Tejada*, the occupant of the apartment being searched was not permitted to answer her telephone when a next door neighbor called the apartment after the officers had entered. *Id.* at *3. Moreover, it was not clear whether that incident occurred before or after the consent to search form was signed by the occupant. *Id*. In any event, the court determined that this incident "does not amount to holding [the occupant] 'incommunicado,' and it does not negate the voluntariness of [the occupant's] consent." *Id*. The court further noted that, if custody would not vitiate an otherwise voluntary consent under the totality of the circumstances, then a refusal to allow telephone contact certainly would not:

> "[T]he fact of custody alone is not enough to demonstrate involuntariness of consent." *United States v. Vasquez-Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979) (*per curiam*). That a person is "under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion." *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) (citations omitted). *See also United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004). *A fortiori*, a refusal to allow a person to answer a phone call does not amount to coercion of the sort that would overcome a reasonable person's ability to come to a free and unconstrained choice.

*Id.* Thus, notwithstanding the denial of defendant's ability to answer, the court held that the government had met its burden of proving that the consent was voluntary. Similarly, like the court in *Tejada*, this Court finds that the consent to search was voluntary and the agents had a reasonable basis for believing so.[14]

---

[14] Although defendant does not specifically argue this point in his papers, to the extent that defendant may be suggesting that the consent was withdrawn by the act of turning off the computer during the search of the computer by Agent Licitra, the Court also finds that argument to be without merit. As a threshold matter, the Court does not find credible defendant's

Defendant's other arguments are similarly unpersuasive. First, during the hearing, the defendant testified that he saw what appeared to him to be a gun and a can of mace on Agent Licitra's belt. Even assuming *arguendo* that testimony to be true (although not previously mentioned in his pre-hearing affidavit), that fact clearly did not make the circumstances coercive or render his consent to search involuntary. It is undisputed that the agents were in plainclothes, and never drew or referenced any weapons. Under these circumstances, the fact that they possessed weapons clearly would not render his consent involuntary. *See Tejada*, 2005 WL 2677891, at *3 ("It is probably the fact that [the occupant] noticed the weapon of one of the officers, as she said she did. That fact, in the Court's estimation, does not mean much. Most people in New York City (perhaps throughout the country) expect law enforcement officers, even in plain clothes, will have weapons, and the Court does not believe that a reasonable person would feel threatened or coerced in speaking to a law enforcement officer in possession of a weapon which is not drawn.").

Second, to the extent the defendant testified about the timing and sequence of the consent to search in relation to the actual search, the Court did not find defendant's testimony to credible. In particular, defendant testified that (1) he gave verbal consent after he hung up the telephone at approximately 5:45 p.m.; (2) Agent Licitra then began the search before defendant gave written consent; (3) after Agent Licitra turned the computer on, Schaefer told officers he changed his mind, and reached over to shut the computer off after 10-15 seconds; and (4) Schaefer signed the consent to search form after Agent Licitra had already examined the computer. The Court found this testimony wholly incredible in light of the defendant's demeanor, as compared to the other witnesses' demeanors, and the evidence as whole. For example, it makes no sense that defendant claimed to

---

testimony that he told the agents he changed his mind when he turned off the computer; rather, the Court finds (as Agent Lazzara testified) that the defendant simply turned it off. Moreover, the simple act of turning off the computer without more does not qualify as withdrawal of consent under the circumstances. It is well settled that "a withdrawal of consent 'can only be accomplished by an unequivocal act or statement.'" *United States v. Masterson*, No. 2:08-CR-138, 2009 WL 2365334, at *6 (D. Vt. July 29, 2009) (quoting *United States v. Siwek*, 453 F.3d 1079, 1086 (8th Cir. 2006)). Turning the computer off was not an unequivocal revocation of consent because it could have simply been embarrassment that the agents had found the child pornography and, at no point, did defendant state that he no longer gave consent to search and seize the computer even as they took the computer away. Interestingly, the defendant claims to have signed the consent to search and seize *after* turning the computer off (although the Court also does not credit that sequence of events), which is why he cannot argue he withdrew consent by turning it off. In any event, even assuming *arguendo* that the turning off of the computer was a withdrawal of consent, the Court finds that the agents were still authorized at that point to seize the computer under the plain view doctrine because the Court finds that they had already seen child pornography on plaintiff's computer when he turned it off. *See, e.g.*, *United States v. Whaley*, 415 F. App'x 129, 134 (11th Cir. 2011) ("Once [the agent] clicked on the 'auto racing 13' icon [on the computer], the child pornography was in plain view. At that point, the officers had probable cause to seize the computer for further investigation."); *United States v. Highbarger*, 380 F. App'x 127, 131 (3d Cir. 2010) ("Once Agent Hodge had opened the graphic file that contained the image of child pornography, he was entitled to seize that image under the plain view doctrine.").

12

"change his mind" about the consent, shut the computer off, and then (notwithstanding his change of mind) signed the consent to search and seize after the computer was off. Instead, the Court found credible Agent Lazzara's version of these events – namely, (1) the defendant verbally consented and then signed the written consent form; (2) Agent Licitra discovered a number of images that appeared to be child pornography, and asked Schaefer about them; and (3) the defendant became very agitated at that point, and leaned over Agent Lazzara to shut the computer off.[15]

Third, although defendant testified that he did not read the written consent-to-search form before signing it because he did not have his glasses, and thus he did not understand that he had the right to refuse to consent, the Court did not find that testimony to be credible. Instead, the Court finds that the defendant signed the form, understood he had the right to refuse consent, and knew that by executing the form the agents were going to search his computer. In any event, the agents would have had no reason to believe that, based upon the surrounding circumstances, that his consent was not voluntary. *See, e.g.*, *United States v. Nelsen*, No. CRIM. 05-98-P-S, 2006 WL 752778, at * 4 (D. Me. Mar. 22, 2006) ("the defendant's testimony that he did not read the written consent-to-search form before signing it does not render his consent invalid"); *see also United States v. Harrison*, 9 F.3d 1554, 1993 WL 460666, at *2 (9th Cir. Nov. 8, 1993) ("Although she testified that no one informed her of her right to refuse consent and she did not read the consent forms, the surrounding circumstances indicate that her consent was voluntary.").

Fourth, defendant asserts that he was "in custody" while at his home on August 20, 2007. (Def.'s Post-Hearing Memorandum of Law, at 27.). However, the Court disagrees, and finds that a reasonable person in defendant's situation would have understood that he was free to ask the agents to leave and end the interview, and his freedom of action was not curtailed to a degree associated with formal arrest. *United States v. Falso*, 293 F. App'x. 838, 839 (2d Cir.

---

[15] Although defendant sought to undermine Agent Lazzara's credibility by comparing the time of the consent to search form (5:50 p.m.) with the time of the oral search (5:45 p.m.), the Court did not find that this line of questioning undermined Agent Lazzara's credibility in any way, as the alleged discrepancies were explainable and, in any event, immaterial. Finally, the Court notes that, even assuming *arguendo* that defendant's version were credible, the Court would still find that his consent to search was voluntary based upon his verbal consent under the totality of the circumstances here. *See, e.g.*, *United States v. Pollaro*, 733 F. Supp. 2d 364, 369-70 (E.D.N.Y. 2010) ("Although not necessary to address, the court addresses Defendant's argument that the search was unlawful because it was commenced before he signed the written consent form. . . . The temporal sequence of these particular events is, in any event, irrelevant, because, as noted, [the wife of the defendant's] oral consent was sufficient to validate the search."); *United States v. Habershaw*, No. Cr. 01-10195-PBS, 2002 WL 33003434, at *4-5 (D. Mass. May 13, 2002) (verbal consent to search computer valid where verbal consent to search given, then agent reviewed computer images, and then defendant signed written consent form); *see also United States v. Laine*, 270 F.3d 71, 74-75 (1st Cir. 2001) (consent to search valid where officer asked defendant to open computer files showing on the screen, and defendant consented); *United States v. Lemmons*, 282 F.3d 920, 926 (7th Cir. 2002) (upholding search of computer where defendant assented to officer's request to let the officer operate the computer).

2008) ("[t]he test for determining whether an individual is in custody is (1) 'whether a reasonable person, would have thought he was free to leave' . . . and, if not, (2) 'whether his freedom of action has been curtailed to a degree associated with formal arrest.'") (quoting *United States v. Newton*, 369 F.3d 659, 671-72 (2d Cir. 2004)). Moreover, this Court recognizes, as the Second Circuit has explained, that "[a]bsent a formal arrest, interrogations in the 'familiar surroundings of one's own home is generally not deemed custodial,' but under certain circumstances may be." *Id.* at 839 (quoting *Newton*, 369 F.3d at 675). This is not one of those situations where the interview in the familiar surroundings of defendant's home was transformed into a custodial setting. As noted *supra*, the facts of this case – including that (1) defendant let the two agents and detective into his home; (2) the agents and detective were in plainclothes and never drew weapons; (3) defendant was not handcuffed during the interview; and (4) the interview lasted no longer than one-half hour – all support a finding of a non-custodial interview and consent. The fact that the agents and detective did not let the defendant call his brother during the interview does not alter that analysis. As noted above, perhaps the best evidence that the defendant was not in custody and his freedom of action was not curtailed to a degree associated with arrest was the fact that (as defendant confirmed during his testimony) he was allowed to reach over and turn the computer off as Agent Licitra was viewing the computer. In fact, the defendant testified that he was standing up, four or five feet away from the computer, as Agent Licitra searched the computer. No reasonable person who did that could believe they were in custody at that time, or even before that.[16] In any event, even assuming *arguendo* that the defendant was in custody, the Court would still conclude that the defendant's consent was voluntary for the other reasons outlined above, including his signing of the written consent form.[17]

---

[16] For this reason, although not specifically raised by defendant in his motion, the Court concludes that the statements at the time of the interview and consent search were voluntary and properly taken, and no waiver of *Miranda* was required because the interview was not custodial for purposes of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[17] Counsel for defendant suggests that, if he was in custody at the time of the consent, any consent was invalid as a matter of law. *See* Def.'s Post-Hearing Memorandum of Law, at 27-28 ("If Mr. Schaefer was 'in custody' following the coercive encounter with Agent Lazzara that denied him the opportunity to telephone his police officer brother, any 'verbal consent' to search his computer obtained from his shortly thereafter was 'inherently coercive' and invalid as a matter of law in violation of his Fourth Amendment rights."). That legal contention is simply incorrect. *See, e.g.*, *Crespo*, 834 F.2d at 271 ("The district court's factual findings preclude [the defendant's] arguments concerning the voluntariness of his consent to search the apartment. That [the defendant] was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion."); *United States v. Vasquez-Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979) ("[T]he fact of custody alone is not enough to demonstrate involuntariness of consent."). Courts have upheld the validity of consent even in custodial settings. *See, e.g.*, *Crespo*, 834 F.2d at 271-72 (finding valid consent to search even where defendant was under arrest, handcuffed, and not told of his right to refuse consent); *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988) (finding five-hour detention did not render consent to search invalid where the defendant was "not subjected to the kind of intensive

Finally, defendant argues that the consent was invalid because the agents arguably had probable cause to search the computer and, thus, should have gotten a warrant to do so. *See* Def.'s Post-Hearing Memorandum of Law, at 29-30 ("[T]hese federal ("ICE") agents arguably had sufficient probable cause to reasonably believe that evidence of child pornography would be located at the defendant's residence and on his computer prior to August 20, 2007. . . . Accordingly, this was a 'pretextual investigative search' of this defendant's home and his computer on August 20, 2007 to see whether there was some additional incriminating evidence of criminality, and that the government intentionally chose not to obtain a warrant, in lieu of a confirmatory 'consent search,' as a viable, less costly and time-consuming option.") Although defendant suggests that the search should be invalidated because the agents could have obtained a search warrant rather than seeking consent, that argument is utterly without merit. As the Supreme Court has noted, "[i]t is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes." *Schneckloth*, 412 U.S. at 230 (quotations and citations omitted). Moreover, obtaining consent need not be an option of last resort by law enforcement officers. Therefore, there is absolutely nothing improper with agents seeking a valid consent to search even in situations where they have probable cause to obtain a warrant. Accordingly, even assuming *arguendo* that the agents had probable cause to search the defendant's home and computer, the fact that they chose to seek consent first has no legal significance as to the validity of that consent.[18] *See, e.g.*, *United States v. Daniel*, No. 2:11–cr–112–GZS, 2012 WL 135696, at *6 (D. Me. Jan. 17, 2012) ("the fact that a search warrant could have been obtained is irrelevant, if the defendant's consent is obtained").

In sum, after carefully considering the evidence presented at the suppression hearing, the Court finds that the government has met its burden by a preponderance of the evidence that the defendant's consent to search the computer was voluntary and

---

interrogation over many hours or days which would overwhelm [a] frightened prisoner").

[18] Although defendant refers to this practice as an illegal "confirmatory search," such use of that terminology is misplaced. An illegal confirmatory search occurs when law enforcement officers illegally search a location in order to determine if there is any evidence at the location that would be worth the time of obtaining a warrant. Here, the agents were not intending to engage in an illegal search when they approached the defendant's home to see if it was worth obtaining a warrant; rather, their intention was to see if he would voluntarily give consent to search and, if he did not, they would seek a warrant (although that intention was never explained to defendant). This practice does not constitute an "illegal confirmatory search" as that term is used in case authority. *See, e.g.*, *Murray v. United* States, 487 U.S. 533, 540 n.2 (1988) (noting that officers may have misjudged the situation, but that "there [was] nothing to suggest that they went in merely to see if there was anything worth getting a warrant for"); *see also United States v. Nettles*, 175 F. Supp. 2d 1089, 1098 (N.D. Ill. 2001) (describing a "confirmatory search" as one "where officers conduct an illegal search to see if there is anything worth the trouble of getting a warrant"); *United States v. Pena*, 924 F. Supp. 1239, 1256 (D. Mass. 1996) (describing a "confirmatory search" as one where "officers conduct an initial warrantless search to determine whether they would uncover evidence worth the trouble of obtaining a warrant").

freely given. Accordingly, the motion to suppress is denied.

B. Motion to Dismiss the Indictment

Defendant also brought a motion to dismiss the indictment, under the Due Process Clause, based upon pre-indictment delay because the defendant was not arrested and indicted until over two years after the search and seizure at his residence of the computer containing the child pornography. As set forth below, no evidentiary hearing is warranted on that issue and the motion is denied.

It is well settled that "[a]n indictment brought within the time constraints of the statute may nevertheless violate due process where pre-indictment delay has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971)). The rule is based upon the rationale that "where delay prejudices the presentation of a defense and is engaged in for an improper purpose it violates the Due Process Clause because such conduct departs from fundamental notions of 'fair play.'" *Cornielle*, 171 F.3d at 752 (quoting *United States v. Lovasco*, 431 U.S. 783, 795 (1977)). However, to establish such a claim, "[a] defendant bears the 'heavy burden' of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose." *Cornielle*, 171 F.3d at 752 (emphasis in original); *see also United States v. Langella*, 776 F.2d 1078, 1083 (2d Cir. 1985) ("To prevail on his claim that pre-indictment delay violated his due process rights, [the defendant] must prove both that the delay resulted in actual prejudice and that the government's reasons for the delay were improper.").

In the instant case, although there was an over two-year delay between the search at the defendant's home and his arrest and indictment, there is absolutely no evidence that the delay resulted in any actual prejudice. In fact, defense counsel conceded during argument on the motion that no actual prejudice resulted from the delay. *See* Nov. 9, 2012 Tr. at 84 ("I don't think we have any actual prejudice, Judge."). Therefore, given the lack of any actual prejudice to the defendant from the delay, the above-referenced motion to dismiss based upon the pre-indictment delay is denied.[19]

---

[19] The Court also denied an evidentiary hearing on this issue. Defense counsel conceded that he had no evidence of any tactical advantage sought by the government from the delay or any improper purpose, but wanted an evidentiary hearing to explore the government's reasons for the delay. (Nov. 9, 2010 Tr. at 84-5.) However, given that it was undisputed that there was no actual prejudice and that the claim thus must necessarily fail regardless of the government's motive under the two-pronged test articulated by the Second Circuit, the Court determined that an evidentiary hearing on the government's reasons was unwarranted. (*Id.* at 86.)

16

IV. CONCLUSION

For the foregoing reasons, and for the reasons set forth on the record on February 1, 2011, the Court denies defendant's motion to suppress. Similarly, for the foregoing reasons and for the reasons set forth on the record on November 9, 2010, the Court denies defendant's motion to dismiss the indictment for pre-indictment delay, including the request for an evidentiary hearing on that motion.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 1, 2012
Central Islip, New York

\* \* \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 and 610 Federal Plaza, Central Islip, NY 11722, by Allen Lee Bode and Michael P. Canty, Assistant U.S. Attorneys. Defendant William E. Schaefer is represented by John G. Poli, III, John Poli P.C., 200 Laurel Avenue, Northport, NY 11768.